## Commonwealth *vs.* Alexander Mattei.

No. 06-P-1227.

Essex. February 5, 2008. - September 3, 2008.

Present: Cypher, Armstrong, & Rubin, JJ.

Further appellate review granted, 453 Mass. 1101 (2009).

*Constitutional Law,* Confrontation of witnesses, Assistance of counsel. *Practice, Criminal,* Confrontation of witnesses, Assistance of counsel. *Evidence,* Scientific test, Cross-examination, Exculpatory. *Due Process of Law,* Loss of evidence by prosecution. *Deoxyribonucleic Acid.*

At a criminal trial, no error arose from the admission in evidence and the playing for the jury of the tape recording of the victim's 911 call to the police, where the victim was available for cross-examination at trial, and where her testimony belied her statement that she could not remember what she had said in the 911 call [513-514]; likewise, the fact that the 911 tape was the last evidence the jury heard was due to understandable and unavoidable delay inherent in the judge's consideration of an utterly novel question of law raised by the defendant's motion in limine [514].

At a criminal trial, it was not error to let the jury learn that the defendant could not be excluded as a source of mixed samples of deoxyribonucleic acid on the interior doorknob of the victim's residence and on the victim's sweat pants, where the limited results possible from such testing were not presented to the jury as a match, and where the evidence was relevant to the identity of the perpetrator. [514-517] Rubin, J., dissenting.

At the trial of indictments charging the defendant with home invasion, assault with intent to commit rape, indecent assault and battery on a person over fourteen years old, assault by means of a dangerous weapon, and breaking and entering with intent to commit a felony, the judge exercised her discretion reasonably and properly in limiting cross-examination of police witnesses concerning their investigation of case, where she allowed the defendant substantial latitude in constructing his defense that the investigation was flawed in focusing too early on him as the sole suspect. [517-518]

There was no merit to a criminal defendant's claim of ineffective assistance on the part of his trial counsel in failing to move for dismissal of the charges (including, among others, home invasion, assault with intent to commit rape, and assault with a dangerous weapon), or other remediation, based on the investigating police officers' failure to take control of a roll of duct tape that was in the victim's apartment when the officers arrived, which was inferentially brought in by the intruder, who used two strips from it to try to seal the victim's mouth, but which was lost by the time of trial, where the police simply neglected to take possession of the tape, not knowing at that time that it had almost certainly been brought in by the

intruder; where the evidence was not material; and where there was no appreciable prejudice to the defendant from its absence. [518-519]

At the trial of indictments charging, inter alia, home invasion, assault with intent to commit rape, and assault with a dangerous weapon, sufficient evidence permitted a finding by the jury that the roll of duct tape used by the defendant to facilitate the rape by taping the victim's mouth constituted a "dangerous weapon" under G. L. c. 265, §§ 15B and 18C. [519]

INDICTMENTS found and returned in the Superior Court Department on May 22, 2002.

The cases were tried before *Diane M. Kottmyer,* J.

*Bonny M. Gilbert* for the defendant.

*Catherine Langevin Semel,* Assistant District Attorney, for the Commonwealth.

ARMSTRONG, J. On April 2, 2004, a Superior Court jury found the defendant guilty of home invasion, assault with intent to commit rape, indecent assault and battery on a person over fourteen years old, and assault by means of a dangerous weapon (G. L. c. 265, §§ 18C, 24, 13H, and 15B[b], respectively), and breaking and entering with intent to commit a felony (G. L. c. 266, § 17).[1] The defendant alleges numerous errors.

1. *Background.* On the evidence, the jury could properly find that at approximately 1:00 P.M., on April 26, 2002, the thirty-six year old victim, who was legally blind, returned to her apartment, where she lived alone. It was located in a multiple-unit, low-income, elderly housing complex in Andover. As she entered the front foyer and walked down the stairs to the basement where her apartment was located, she observed a man she did not recognize mopping the basement floor. The man in question, the defendant, was working at the apartment complex on a work-release program from the Correctional Alternative Center under the supervision of three Andover housing authority (AHA) employees. One-half hour earlier, Earl Bell, one of the AHA employees, had assigned the defendant to clean the hallways in the victim's apartment building.

After a brief exchange of words with the defendant, the victim entered the door to her apartment, closed the door behind her,

---

[1]The defendant was also found guilty of assault and battery, G. L. c. 265, § 13A. That indictment was placed on file with the defendant's consent.

locked it with a "push-button" mechanism, and prepared to take a nap by removing her skirt and blouse. While she was changing, she heard a knock. Through the closed door, she spoke with a person who she thought was the man she had just seen mopping the floor (the defendant acknowledged to the police it was he who had knocked) informing her that she should be careful if she left the apartment because the floors were wet and slippery.

A minute or two later, an intruder opened the door to her apartment and entered. The intruder grabbed her from behind and told her, "Be quiet. I just want to make love to you." Given his position, she was not able to observe the intruder's face, but she was able to discern that he was a white male (possibly Hispanic), taller than she, with a medium-heavy build, and wearing a white or light gray sweatshirt and sneakers.

The intruder grabbed the victim around the neck and applied pressure on her neck with the inside of his elbow. He placed his hand on her mouth tightly, up against her nostrils, to the point that she complained of having difficulty breathing. She pulled at his hand in an effort to release the pressure, scratching his hand in the process.

When the intruder loosened his grasp slightly, the victim managed to get away and ran to the telephone. He quickly chased after her, knocked the telephone from her hand, and grabbed her from behind again by placing his hand over her mouth and applying pressure on her neck with the inside of his elbow. She made repeated efforts to struggle free, once calling out to a nearby neighbor, who later reported having heard only muffled sounds. The intruder struck her in the face more than once, knocking off her thick, "Coke-bottle" like glasses onto the floor and causing her to bleed from the nose.[2]

Fatigued by the effort to escape, the victim gave up resisting, and the intruder forced her on the bed, stomach-side down, hands spread in front of her. Although pinned by his weight, she pulled her underpants down on demand. During the assault, the intruder used a piece of duct tape roughly seven inches long to cover the victim's mouth. She managed to work the tape off

---

[2]More intrinsically serious, the punches caused internal bleeding in her right eye, which was the sole source of her limited vision.

from her mouth, however, and his repeated efforts to seal her mouth with another piece of duct tape proved unsuccessful.

The intruder attempted anal rape, "thrusting, and trying to get in." His attempts continued for what "seemed like . . . a long while." The intruder then "just stopped," put his pants back on, and left the apartment, closing the door behind him. The victim estimated that the entire assault, from the time the intruder entered the apartment to the time he left, took ten to fifteen minutes.

After several minutes of groping, without glasses, for the telephone, which had been knocked to the floor by the intruder, the victim reached a 911 operator. The call took place no more than five minutes after the intruder left the apartment. At 1:23 P.M., Officer Michael Connor arrived and observed the victim in her sports bra and underwear, still on the phone with the 911 dispatcher. He noted further that she was shaking nervously, had blood on her face, a black eye, bruises, and blood on her hands. The victim complained of a "black spot" on her eye, obscuring her already limited vision, which was eventually revealed to be the result of bleeding that occurred behind the retina of her right eye. After telling the officer that a man wearing a white sweatshirt had broken in, beaten her, and raped her, she was taken to Lawrence General Hospital to receive medical assistance.

2. *The tape recording of the 911 call.* The defendant objected to the Commonwealth's putting in evidence, and playing for the jury, the recording of the victim's 911 call to the police, on the basis that (1) the recording was "testimonial" under *Crawford* v. *Washington*, 541 U.S. 36, 51-52 (2004), and *Davis* v. *Washington*, 547 U.S. 813 (2006), and (2) the victim, because of her inability to remember what she had said to the police 911 dispatcher during that call, was "unavailable" for cross-examination. For purposes of decision, we can assume, without deciding, that the conversation on the 911 recording was testimonial. The victim was not, however, unavailable for cross-examination. She in fact testified at the trial.

The defendant bases his claim that the victim was "unavailable for cross-examination" on an assertion that she could not remember what she had said in her 911 call to the police. The

victim did so state. "Unavailability as a witness," the defendant argues, quoting from Rule 804(a)(1) of the Uniform Rules of Evidence,[3] "includes situations in which the declarant . . . (C) testifies to a lack of memory of the subject matter of [her] statement." The victim's testimony, however, belies her statement that she could not remember, which seems to be true only in the limited sense that she could not then, at trial, recall everything she had said in the 911 call two years earlier. Much of what she said she did remember. Moreover, she had a remarkably detailed present memory of the events preceding her 911 call and could be effectively cross-examined on statements made to the dispatcher during the call.

A subsidiary contention is that the judge, who was faced with ruling on the *Crawford* motion the first day of the trial, withheld a ruling until the fifth day with the result that the jury did not hear the 911 recording until the sixth day, as the last evidence in the trial. Thus, the defendant was put, as his counsel ruefully explained, "in [the] untenable position of putting, as the last thing the jury hears, the complaining witness back in front of the jury to recount that initial moment." Although courts "have frequently expressed [their] preference for early rulings on motions in limine," *Commonwealth* v. *Vaidulas*, 433 Mass. 247, 250 (2001), here the judge was faced with a question (what makes a report "testimonial"?) under the *Crawford* decision that was utterly novel (*Crawford* was decided March 8, 2004, and the trial began March 24, 2004) and remains a gray area four years later. The conscientious judge had not yet read the case and had to ponder with little assistance the extent to which the spontaneous utterance exception to the hearsay rule survived it. The delay was understandable and unavoidable, however unfortunate the effect on the defendant's preferred order for presentation of the Commonwealth's case.

3. *The inconclusive DNA evidence.* In the investigation following the victim's removal by ambulance to the hospital, the police located a crumpled, bloodstained, white sweatshirt in a trash can in the laundry room across the hall from the victim's apartment. The sweatshirt was linked to the defendant by two AHA employees, one of whom had given it to the defendant the

---

[3]Uniform Rules of Evidence (National Conference of Commissioners on Uniform State Laws 1999).

previous week, and another who claimed to have seen the defendant wearing it that morning. Shortly after the crime, that employee saw the defendant no longer wearing the sweatshirt and in a different building (which struck the employee as odd because he knew the defendant's work assignment that day was at the victim's building). Through DNA testing, the State police crime laboratory was able to make positive identification of both the victim's and the defendant's DNA on the sweatshirt. That match, including the gathering, testing, and analysis of the results, came in without objection and with the usual astronomical improbabilities of others being the source of the DNA. Given the victim's impairments in identifying the defendant as the intruder, the sweatshirt DNA results were doubtless the most incriminating evidence against the defendant.

The defendant objected when the Commonwealth put in evidence the police chemist's testimony that DNA tests of stains on the defendant's sweatpants and of a swabbing from the doorknob on the inside of the victim's apartment door were, because of a mix of DNA from different persons, inconclusive, such that the defendant could not be identified as a source of the DNA on the doorknob but also could not be excluded as a source,[4] and the victim could not be identified as a source of the DNA on the defendant's sweatpants but also could not be excluded as a source.

On appeal, going somewhat beyond the objection at trial, the defendant argues that inconclusive DNA testing results, like positive matches, should not come in evidence without a statistical analysis enabling comparison to the statistical likelihood of a random match. See *Commonwealth* v. *Curnin*, 409 Mass. 218, 222 n.7 (1991). See also *Commonwealth* v. *Mathews*, 450 Mass. 858, 871 (2008). The defendant relies on *Commonwealth* v. *Lanigan*, 419 Mass. 15, 20 (1994) (*Lanigan II*) ("Evidence of a match based on currently used testing processes is meaningless without evidence indicating the significance of the match"). The chemist, Stacey Edward, who had done the DNA testing and analysis at the State police crime laboratory, explained that

---

[4]The defendant objected: "[I]t's my expectation that her answer will be that it [i.e., the testing] yields a substance that cannot exclude Alexander Mattei and as a result, I submit, that would be too confusing to this jury. They may use the failure to exclude as inculpatory of him when that is not —"

certain of the samples she had to work with showed DNA of more than one person, such that at various sites on the DNA band she found the alleles that one with the defendant's DNA profile would leave but other alleles as well, with the result that the defendant could not be excluded as a source of the DNA, but also could not be identified as a source.[5] Beyond this, Edward did not go; she had not attempted a statistical analysis.[6]

It was not error to let the jury learn that the mixed DNA samples on the interior doorknob and on the defendant's sweatpants could not be excluded as having come from the defendant or the victim respectively. "That a scientific test provides descriptive information short of a definitive identification does not make it unreliable, irrelevant, or otherwise inadmissible. Very general descriptive information about a perpetrator (e.g., height, weight, hair color) is routinely admissible, even though the traits described are not unique to a defendant." *Commonwealth v. McNickles*, 434 Mass. 839, 854 (2001). There, as here, the limited results possible from DNA testing of mixed samples were deemed admissible, so long as they were not presented to the jury as a match.[7]

This case presents a situation similar to that envisioned in *Commonwealth v. Mathews*, 450 Mass. at 872, in which the defense is urging that the investigation was deficient for failing

---

[5]This is in contrast to a situation where the alleles found in a DNA sample do not include any alleles matching those of a defendant, so that he can be excluded as one of those whose DNA is represented in the sample. Comparison can be made to blood type tests, which are routinely accepted in evidence and which are normally used only to show that the defendant's blood type is or is not consistent with the blood tested. See *Commonwealth v. McNickles*, 434 Mass. 839, 854 n.28 (2001), citing *Commonwealth v. Sparks*, 433 Mass. 654, 660 (2001).

[6]Requiring statistical, or probability, evidence as a condition of the admissibility of an allele match or a genotype match (between the sample and the defendant's exemplar) at a single site deemed too statistically insignificant to support a positive identification could prove highly damaging to defendants as a class, as contrasted with the usual "consistent with" or "could not be excluded" type of evidence. See, e.g., *Commonwealth v. McNickles*, 434 Mass. at 854 n.26.

[7]An additional advantage of using the "cannot be excluded" type of presentation is that it avoids having the jury fixated on the calculation of mathematical odds, instead of on other serious questions, such as whether the defendant was in fact wearing the sweatshirt the day of the crime as contrasted with someone else wearing the defendant's sweatshirt while committing the crime.

to utilize DNA testing more extensively (failure to test exemplars from AHA employees, who had access to master keys, against the samples of crime scene bloodstains), and the Commonwealth, in response, is trying to demonstrate the extent of the testing it did employ, even if the testing was inconclusive. The *Mathews* decision approved the "chemist simply inform[ing] the jury that the significance of an inconclusive result is 'that there was just not enough DNA information in the DNA profile we obtained to either include or exclude' [the defendant in that case] (or [the victim]) as a potential match." *Ibid.* The key to admissibility is relevance. "A trial judge's determination of the relevance of DNA test results is no different from other evidentiary decisions, and we will afford that decision substantial deference." *Id.* at 872 n.15. See *Commonwealth* v. *Nesbitt*, 452 Mass. 436, 253 (2008). Similarly, here we find no fault with the judge's determination as to the relevance of the DNA testing on the doorknob and the sweatpants.

4. *Limiting cross-examination.* The defendant's strategy at trial was to show that the police had conducted a flawed investigation, settling too early on the defendant as the sole suspect upon learning that he was a convict on work release, and hence neglecting to do DNA testing and fingerprinting on the three AHA employees. Two in fact had significant criminal records: Francisco Roman, a conviction in Puerto Rico of second-degree murder in 1995; and Robert Dion, a charge of aggravated rape in 1986 in Essex County, on which he had ultimately pleaded guilty to the lesser-included offense of assault and battery. The judge allowed the defendant's counsel to elicit from the investigating officers that they had not asked the three AHA employees whether they had prior criminal records, but she did not permit counsel to ask the officers whether the knowledge that two of the AHA employees had prior criminal records would have been important to the investigation.

Bearing in mind that the defendant's purpose was to show a flawed investigation,[8] the judge allowed the defendant substantial latitude in constructing that defense. Specifically, she allowed it to be brought out (1) that two of the employees had

---

[8]The defendant's counsel specifically eschewed a purpose to impeach either Dion or Roman, and, in any event, the conditions of the statute authorizing impeachment by prior conviction, G. L. c. 233, § 21, were not met.

prior records; (2) that the police had failed to ask them about their records and failed to check their criminal histories; (3) that the police did not make fingerprint comparisons to the prints of Dion or Roman; (4) that two of the employees had access to the master key for the victim's building; and (5) by stipulation, that Roman had been convicted in 1995 of second-degree murder.

"While a criminal defendant is entitled to a reasonable cross-examination of the Commonwealth's witnesses, the scope of the cross-examination rests largely within the discretion of the trial judge, and . . . will not [be] disturb[ed] . . . unless the defendant demonstrates that [he] was prejudiced . . . ." *Commonwealth* v. *Farley*, 443 Mass. 740, 748 n.12 (2005), and cases cited. The judge was not obliged to let the defendant divert the trial into collateral matters; the important aspect of the witnesses' criminal records was that the police had failed to investigate so as to learn whether those employees had records and should be investigated more extensively, as the defendant was. The judge exercised her discretion reasonably and properly.

5. *Roll of duct tape.* The defendant argues that his trial counsel provided ineffective assistance by failing to move for dismissal of the charges, or other remediation, based on the investigating police officers' failure to take control of a roll of duct tape that was in the victim's apartment when the officers arrived. The victim did not have duct tape in her apartment; inferentially it was brought in by the intruder, who used two strips from it to try to seal the victim's mouth. Those two strips remained, but fingerprint traces were too smeared for print comparisons. A witness testified that duct tape can be a good medium for fingerprints; but the remaining roll (it showed in the police photographs) had not been tested and was lost by the time of trial.

The situation was not one calling for sanctions. The judicial remedy for destruction or loss of potentially exculpatory evidence turns on three factors: the culpability of the Commonwealth, the materiality of the evidence, and the potential prejudice to the defendant. *Commonwealth* v. *Willie*, 400 Mass. 427, 432 (1987). As to culpability, this case is unlike *Commonwealth* v. *Sasville*, 35 Mass. App. Ct. 15, 18, 22-24 (1993) (where the Commonwealth intentionally authorized the destruction of an aborted fetus, eliminating the defendant's chance to prove con-

clusively through blood tests that he was not the father), and also unlike *Commonwealth* v. *Willie, supra* at 429-430 (where the Commonwealth either used up or failed to preserve secretion samples from a sheet which the defendant sought access to for his own testing). In this case, so far as the evidence shows, the police investigators simply neglected to take possession of the roll of duct tape, not knowing at that time that it had almost certainly been brought into the apartment by the intruder. The defendant's speculation that bad faith may have been involved is the product not of reasonable possibility based on "concrete evidence" but rather on "fertile imagination." *Commonwealth* v. *Neal*, 392 Mass. 1, 12 (1984). As to materiality, while the roll of tape might have shown fingerprints of one other than the defendant, such a showing would not have definitively excluded the defendant as the intruder, because it came, most likely, from a supply of such tape in a housing authority storeroom and might have been touched by others. As for prejudice to the defendant, the testimony that duct tape was a good medium for fingerprints referred to the sticky side of the tape, which, the testimony went, preserves a good print unless it is restuck, destroying the image. The slippery side of the tape is prone to smearing. The two strips with which the intruder tried to seal the victim's mouth showed the practical limitations of duct tape as a fingerprint-preserving medium.

Finally, the defendant's contention that there was insufficient evidence to permit a finding by the jury that the roll of duct tape, used by the defendant to facilitate the rape by taping the victim's mouth, constituted a "dangerous weapon" under G. L. c. 265, §§ 15B and 18C, is untenable in light of *Commonwealth* v. *Cruz*, 430 Mass. 182, 194-195 (1999).

*Judgments affirmed.*

RUBIN, J. (dissenting). This case is controlled by *Commonwealth* v. *Curnin*, 409 Mass. 218, 222 n.7 (1991). There the Supreme Judicial Court concluded that, because DNA testing "has too great a potential for affecting a jury's judgment . . . we would not permit the admission of test results showing a

DNA match (a positive result) without telling the jury anything about the likelihood of that match occurring."[1] Thus, "expert testimony concerning a DNA match [must] be accompanied by information indicating the probability that the match in question might have occurred by chance." *Commonwealth* v. *Thad,* 59 Mass. App. Ct. 497, 505-506 (2003).

DNA testing operates by comparing DNA evidence with a known examplar of the DNA of a particular person. The DNA is compared by examining the alleles at certain specific loci, chosen because of their variability among the human population, see *Curnin, supra* at 228, to see if the alleles at those loci are the same as the alleles at those loci on the exemplar. See *Commonwealth* v. *Vao Sok,* 425 Mass. 787, 790 (1997). Thus, for example, one DNA test permits an examination of the alleles at six loci; another at thirteen loci, as well as a gender identification locus. See *State* v. *Salmon,* 89 S.W.3d 540, 544 (Mo. Ct. App. 2002). If a single person's DNA is tested, and a sufficient number of loci are compared, and if the alleles at all of the loci correspond to an individual's exemplar, one can make an identifying match, calculating that there is an astronomically high likelihood that the individual who provided the exemplar was the source of the DNA. If at any locus there is not a match, the individual can be excluded as the source of the DNA.

The defendant's DNA was not found on anything inside the victim's apartment. It was found on what was conceded to be his own sweatshirt — one he claimed not to have himself been wearing on the day of the crime — which was found in a trash can. (A witness testified that he had seen the defendant wearing the sweatshirt that morning and on the way to and inside a bank about an hour before the attack; a picture of the defendant taken at the bank showed that he was not wearing it.) The victim's

---

[1]On this record, it does not appear that the test results in this case can be characterized as the kind of "inconclusive" ones that would have been inadmissible because they were not "probative of an issue of consequence in the case." *Commonwealth* v. *Nesbitt,* 452 Mass. 436, 254 (2008). See *ibid.* (describing testimony that defendant "couldn't be excluded" as a potential match for DNA evidence where no one could be excluded because the DNA could have come from anyone).

DNA was not found on any of the clothing the defendant was wearing at the time of his arrest on the day the crime occurred.

Over the defendant's objection, the Commonwealth's expert testified that mixtures of DNA were found on the defendant's sweatpants and on the inside doorknob of the victim's apartment. She testified first about how DNA testing kits work. The expert's testimony related essentially to matching alleles at certain DNA loci found in the mixtures with the alleles at the same loci in DNA exemplars from the victim and the defendant.[2] An excerpt of her testimony, which refers to two charts that were introduced in evidence, will give a sense of her testimony:

> "For the known sample for [the defendant], it's the same locations that I mentioned in the previous [known] sample [from the victim], and the numbers are 16, 16 for [location] D3.
>
> "14, 18 for VWA [location].
>
> "18, 25 for FGA [location].
>
> "For gender, it's an 'X' and 'Y', representing male.
>
> "At V8, there's a 10 and 14.
>
> "At V21, it's 31 and 31.2.
>
> "D18 is 12 and 15.
>
> "D5 is 12 and 13.
>
> "D13 is 11 and 13.
>
> "D7 is 8 and 11."

She testified that the mixture on the doorknob was "a mixture of DNA consistent with [that of the defendant] and [that of the victim]." She said that the defendant "is included as a potential contributor of the major male profile in the DNA mixture" and

---

[2] Detailed descriptions of DNA evidence and methods of DNA analysis can be found in a number of cases, including *Commonwealth* v. *McNickles*, 434 Mass. 839 (2001), and *Armstead* v. *State*, 342 Md. 38 (1996).

that the DNA in the mixture on the doorknob was "concordant with" the defendant's DNA. She said:

> "Now, the samples that are concordant with the second known sample, which is from [the defendant], include the sweatshirt front. You can see that at each location . . . each of these numbers are represented . . . . And again, it's repeated here, as a single source, in the t-shirt, all the numbers are represented again.
>
> "Then, we get to the mixture sample. And in this situation, with the swab of the doorknob, the numbers here are represented as being concordant with those that are bolded in the sample: 16, 14, 18, and so on.
>
> "Then, in this sample of the sweatpants, at the bottom, there wasn't enough DNA of that minor contributor to be able to make a comparison to the known sample of [the defendant]. So, there has been no conclusion made; only to the major profile which is represented in the bold."

She also testified that the victim was "included as a potential source" of some of the mixture on the defendant's sweatpants. Her detailed testimony was as follows: "Then, also, there's the next mixture, which is the sweatpants. And in this situation, you can see that the numbers that are concordant with [the victim's] profile, this time it's the major profile. So, the numbers, here, are bolded; the 17, 18 is the same. The 17, 19. The 20, 21, and so on."

The expert did not indicate what the statistical probability was that the defendant contributed to the doorknob mixture or the victim to the sweatpants mixture. The jury did not know. We do not know. With respect to the doorknob, the court says, *ante* at 516, that "at various sites on the DNA band [the expert] found the alleles that one with the defendant's DNA profile would leave but other alleles as well, with the result that the defendant could not be excluded as a source of the DNA . . . ."

Does this mean that half the people in the world could have left the DNA that was found in the mixture? Does it mean that only one in a billion could? We have no idea. But the court concluded in *Curnin* that where DNA evidence is used by the

prosecution, there is a substantial risk that the evidence could be mistakenly understood definitively to implicate the defendant, here, for example, placing him inside the victim's apartment. See *id.* at 219, 222 n.7, 227. Indeed, although there is no information in the record about how likely it is that the alleles found in the swab from the victim's apartment came from the defendant, the Commonwealth itself in its brief actually treats the DNA evidence as definitive, saying the defendant's "DNA, albeit a mixture of DNA and not a match, was found on the interior doorknob of the victim's apartment."

Because of *Curnin,* this DNA mixture evidence should not have been admitted "without telling the jury anything about the likelihood of th[e] match" occurring between the alleles found on the doorknob and the alleles in the defendant's sample and between the alleles found on the sweatpants and the alleles in the victim's sample. *Id.* at 222 n.7. *Commonwealth* v. *McNickles,* 434 Mass. 839, 854 (2001), is not to the contrary. There, the Supreme Judicial Court upheld the introduction of a DNA test result like that at issue here — that "did not amount to or purport to be an actual identification of the defendant," but "yielded only descriptive information concerning the perpetrator." The court explained that "[i]f the Commonwealth's expert's view were accepted by the jury, the descriptive information from the test was the perpetrator's genotype at that one site (a homozygous 4.$^2$/3), a trait shared by the defendant and many members of the general population." *Ibid.* But, in that case, as the court noted, the expert's testimony addressed how many individuals shared that DNA trait.[3] The *McNickles* case does not suggest that the introduction of DNA test results short of an identifying match does not require that the jury be provided with some basis for understanding the probability they represent.

---

[3]"The frequency of a homozygous 4.$^2$/3 at the DQA1 site varies from a low of one in 1,000 in the Caucasian population, to one in 100 in the African-American population, to as high as one in eighty-three in the Hispanic population. Defense counsel's cross-examination of [the Commonwealth's expert] walked through the arithmetic of how many out of 1,000 African-Americans, 10,000 African-Americans, 100,000 African-Americans, and one million African-Americans would have this same genotype, and then pointedly asked her if she knew how many African-Americans lived in Boston." *Id.* at 854 n.26.

And other jurisdictions that require statistical information to accompany DNA evidence do so where the evidence is something less than an identifying match. See, e.g., *People* v. *Coy*, 243 Mich. App. Ct. 283 (2000); *Armstead* v. *State*, 342 Md. 38 (1996). Indeed, because of "the usual astronomical improbabilities of others being the source of the DNA" when an identifying match is found, *ante* at 515, it would seem that the rule requiring that DNA evidence be accompanied by statistical information is of the most importance in cases like this where the statistical probability that the DNA sample tested came from a particular source is substantially lower than where DNA evidence is sufficient to provide a match that actually identifies the defendant as the perpetrator. See *Young* v. *Maryland*, 388 Md. 99, 110-117, 119-120 (2005) (distinguishing *Armstead* v. *State*, *supra*, and holding that although supporting statistics are required when DNA evidence falling short of an identifying match is admitted, "[w]hen the random match probability is sufficiently minuscule, the DNA profile may be deemed unique. In such circumstances, testimony of a match is admissible without accompanying contextual statistics").

Expert testimony concerning a match of some alleles in a DNA mixture, like expert testimony concerning an identifying DNA match, must be accompanied by statistical information indicating the probability that the match might have occurred by chance. Because the DNA evidence here was not accompanied by such information, the defendant is entitled to a new trial. I therefore respectfully dissent.